FILED

MAY - 8 2023

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

23 CR 284

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **Violations:** Title 18, |
| | ) | United States Code, Sections |
| v. | ) | 1341 (Mail Fraud), 1343 (Wire Fraud), |
| | ) | 1956(a)(1)(B)(i) (Money Laundering), |
| RICHARD L. CARLINO | ) | and 1014 (False Statements) |

JUDGE COLEMAN

**COUNT ONE**
**(Wire Fraud)**

MAGISTRATE JUDGE FUENTES

The SPECIAL MAY 2022 GRAND JURY charges:

**Background**

1.      At times material to Counts One through Five of this indictment:

a.      Defendant RICHARD L. CARLINO was the owner and manager of a real estate investment company called "South Suburban Investment Group, LLC" (SSIG).

b.      SSIG had no owners, managers, or employees other than CARLINO.

c.      CARLINO solicited people to invest in SSIG, which he portrayed as an established business that (i) was involved in the acquisition, rehabilitation, and resale of real estate, and (ii) provided "hard money" and joint venture financing to borrowers for real estate investment and development.

### The Scheme to Defraud

2.      Beginning no later than in or about 2015, and continuing through at least 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

### RICHARD L. CARLINO,

defendant herein, knowingly devised and intended to devise a scheme to defraud and to obtain money from investors by means of materially false and fraudulent pretenses, representations, and promises, as described below.

3.      It was part of the scheme that CARLINO solicited investors by falsely guaranteeing double-digit investment returns that he knew he was incapable of paying.

4.      It was further part of the scheme that CARLINO provided written investment materials and contracts to at least two different investors ("Victim 1" and "Victim 2"), in which he promised to invest their funds in real estate and to make regular interest payments of at least 12% per year, plus a certain percentage of any net profits generated by SSIG. CARLINO knew, at the time he made those promises and guarantees, that SSIG did not then have a portfolio of real estate that was generating cash flow or any other assets to support the investment returns guaranteed by him.

5.      It was further part of the scheme that CARLINO fraudulently converted investor funds to the personal use of himself and members of his family, without the investors' knowledge and consent.

## Victim 1

6. It was further part of the scheme that CARLINO fraudulently induced Victim 1 to provide him with $100,000 by guaranteeing, in writing, "a minimum of 12% return on investment per Annum," plus a substantial share (at least 40%) of SSIG's remaining net profits, knowing that SSIG could not actually guarantee and pay such investment returns.

7. It was further part of the scheme that CARLINO falsely portrayed SSIG as a risk-free or low-risk investment, claiming that SSIG "[g]uaranteed ROI [return on investment] unlike the stock market" and that "SSIG Investors earn a minimum of 12% ROI without the risk of a volatile market fluctuation."

8. It was further part of the scheme that CARLINO misled Victim 1 into believing that all of her investment funds would be invested in real estate, when he knew that he would use her investment funds for other purposes.

9. It was further part of the scheme that CARLINO made false promises and representations to Victim 1, including that:

a. 12% interest payments would be paid to Victim 1 on a monthly basis;

b. Victim 1 would be paid a pro rata, 40% share of any additional profits exceeding 12%;

c. those additional, "other profits" would be paid out before January 31 of the following year; and

3

d.     Victim 1 could request "an immediate payout" of her investment if SSIG was "unable to pay out the minimum 12% for any reason," after which SSIG would have "5 business days to honor the request."

10.    It was further part of the scheme that CARLINO did not invest Victim 1's investment funds as he had promised to do; no real estate assets were acquired and rehabilitated with Victim 1's money.  Instead, CARLINO used Victim 1's money for his own personal benefit by transferring her money to other personal and business accounts under his control and by making payments to others, including an earlier SSIG investor—all without Victim 1's knowledge and consent.

11.    It was further part of the scheme that CARLINO did not pay timely, regular investment returns to Victim 1, as he had guaranteed to Victim 1 in writing.

12.    It was further part of the scheme that several years after Victim 1 made her $100,000 investment, CARLINO made three payments to her, each such payment in the amount of $5,000—such payments being funded partly with money that CARLINO had fraudulently obtained from another victim (Victim 2), not with cash generated by any existing real estate portfolio or assets acquired and developed with Victim 1's investment funds.

13.    It was further part of the scheme that CARLINO made no further payments to Victim 1, and failed to return the rest of her money, despite requests from her to do so.

14. It was further part of the scheme that CARLINO failed to provide Victim 1 with any record of what he had actually done with her money, and discontinued communications with her.

## Victim 2

15. It was further part of the scheme that CARLINO fraudulently induced Victim 2 to provide him with $500,000 by making the same sort of false promises, representations, and guarantees that he had made to Victim 1.

16. It was further part of the scheme that CARLINO—in conversations, emails, and letters to Victim 2—knowingly and intentionally misled Victim 2 into believing that SSIG was actively buying, rehabbing, and reselling real estate at substantial profits, when in fact SSIG was not doing so.

17. It was further part of the scheme that CARLINO tendered a real estate investment contract to Victim 2, and addendums thereto, in which he falsely promised to pay interest to Victim 2 at a rate of 12% per year—such so-called "returns on investment" to be paid quarterly (March 31, June 30, September 30, and December 31)—plus 20% of any net profits from the sale of real estate acquired with Victim 2's investment funds.

18. It was further part of the scheme that CARLINO falsely promised to refund Victim 2's investment, within 60 days of Victim 2's request, if SSIG failed to pay the minimum 12% return on investment for two consecutive quarters during a two-year holding period.

19.     It was further part of the scheme that CARLINO knowingly and intentionally failed to disclose to Victim 2 that SSIG had already defaulted on its "guaranteed" quarterly interest payments to at least one other investor (Victim 1).

20.     It was further part of the scheme that CARLINO falsely represented that SSIG would use Victim 2's investment funds to invest in "various parcels of real estate"—meaning "acquiring, rehabbing, and lending for real estate projects"—and that SSIG would "build a portfolio of real estate assets in order to provide a stable cash flow to SSIG (for purposes of paying the investors)."

21.     It was further part of the scheme that CARLINO did not use all of Victim 2's money to build a portfolio of real estate providing a stable cash flow, as he had promised to do.  Instead, CARLINO used only a portion of Victim 2's investment funds to buy, rehab, and resell only one piece of property—the profits from which he did not share with Victim 2, as he had agreed to do by contract.  CARLINO fraudulently disposed of the rest of Victim 2's investment funds to pay certain personal debts and expenses, such as credit card bills and home mortgage payments, unrelated to investments in real estate for the benefit of Victim 2.  CARLINO also fraudulently used Victim 2's money to make belated "interest" payments to Victim 1 and other earlier SSIG investors, among other payments inconsistent with the representations, promises, and guarantees that CARLINO had made to Victim 2.

22.     It was further part of the scheme that CARLINO made four purported interest payments to Victim 2, in an amount totaling approximately $77,218, falsely leading Victim 2 to believe that all of his money had been invested in a real estate

portfolio that was generating investment returns, when in fact SSIG had only bought and sold one property and did not have a real estate portfolio. CARLINO made at least two of those purported interest payments by fraudulently paying Victim 2 with Victim 2's own money.

23.    It was further part of the scheme that CARLINO did not return the rest of Victim 2's money, despite requests from Victim 2 to do so. Nor did CARLINO provide Victim 2 with any financial statements and records that fully and truthfully reflected what he had actually done with Victim 2's money.

24.    It was further part of the scheme that CARLINO misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence of the scheme, the purposes of the scheme, and the acts committed in furtherance of the scheme.

25.    As a result of CARLINO's false and fraudulent representations, promises, acts, and omissions, victim-investors suffered losses in an amount totaling more than $500,000.

## Execution of the Scheme

26.     On or about June 4, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

RICHARD L. CARLINO,

defendant herein, for the purpose of executing the scheme described above, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an electronic transfer of funds in the amount of $200, from a CARLINO family checking account to a credit card account in the name of CARLINO's wife, using Victim 2's investment funds to make that credit card payment without Victim 2's knowledge and consent;

In violation of Title 18, United States Code, Section 1343.

## COUNT TWO
### (Wire Fraud)

The SPECIAL MAY 2022 GRAND JURY further charges:

1.      Paragraphs 1 through 25 of Count One are incorporated here.

2.      On or about June 7, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

RICHARD L. CARLINO,

defendant herein, for the purpose of executing the scheme described above, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an electronic transfer of funds in the amount of $188, from a CARLINO family checking account to a credit card account in the name of CARLINO's wife, using Victim 2's investment funds to make that credit card payment without Victim 2's knowledge and consent;

In violation of Title 18, United States Code, Section 1343.

## COUNT THREE
### (Mail Fraud)

The SPECIAL MAY 2022 GRAND JURY further charges:

1.      Paragraphs 1 through 25 of Count One are incorporated here.

2.      On or about August 15, 2018, in the Northern District of Illinois, Eastern Division,

RICHARD L. CARLINO,

defendant herein, for the purpose of executing the scheme described above, and attempting to do so, knowingly caused to be delivered by mail, according to the direction thereon, a check written on SSIG's bank account payable to Victim 2 in the amount of $15,000, such payment purportedly representing interest earned on Victim 2's investment;

In violation of Title 18, United States Code, Section 1341.

## COUNT FOUR
### (Mail Fraud)

The SPECIAL MAY 2022 GRAND JURY further charges:

1.  Paragraphs 1 through 25 of Count One are incorporated here.

2.  On or about September 26, 2018, in the Northern District of Illinois, Eastern Division,

RICHARD L. CARLINO,

defendant herein, for the purpose of executing the scheme described above, and attempting to do so, knowingly caused to be delivered by mail, according to the direction thereon, a check written on SSIG's bank account payable to Victim 2 in the amount of $15,000, such payment purportedly representing interest earned on Victim 2's investment;

In violation of Title 18, United States Code, Section 1341.

## COUNT FIVE
### (Wire Fraud)

The SPECIAL MAY 2022 GRAND JURY further charges:

1. Paragraphs 1 through 25 of Count One are incorporated here.

2. On or about March 7, 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

RICHARD L. CARLINO,

defendant herein, for the purpose of executing the scheme described above, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email from CARLINO to Victim 2, stating, among other things, "I am working on getting you the interest" (meaning the interest owed on Victim 2's investment), when in fact, as CARLINO then knew, that representation was misleading because SSIG was not then managing any interest-bearing real estate assets for the benefit of Victim 2;

In violation of Title 18, United States Code, Section 1343.

## COUNT SIX
### (Mail Fraud)

The SPECIAL MAY 2022 GRAND JURY further charges:

1.      Paragraph 1 of Count One is incorporated here.

2.      At times material to Counts Six through Nine of this indictment:

      a.      "RealtyOne & Associates, LLC" (RealtyOne) was a real estate brokerage managed by CARLINO and owned nominally by his wife and son.

      b.      "True Respiratory Care & Medical Management, LLC" (True Respiratory Care) was a health care provider managed by CARLINO, his wife, and others, operating out of the same suburban office suite as RealtyOne.

      c.      The U.S. Small Business Administration (SBA) was a United States government agency that provided economic support to small businesses.

### The Paycheck Protection Program

      d.      The Coronavirus Aid, Relief, and Economic Security (CARES) Act was a federal law enacted in or around March 2020 to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

      e.      One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses and sole proprietors for job retention and certain other business expenses, through a program called the Paycheck Protection Program (PPP).  In or around April 2020, Congress authorized over $320 billion in additional funding for PPP loans.

f. To obtain a PPP loan, a business, sole proprietor, or self-employed individual submitted a loan application, which was required to be signed by the applicant or an authorized representative of the business. The PPP loan application further required the applicant to acknowledge Program rules and to make certain affirmative certifications regarding the eligibility of the business, proprietorship, or individual loan applicant. In PPP loan applications, businesses, sole proprietors, and self-employed individuals were required to provide, among other things, their number of employees and average monthly payroll. Those figures were used to calculate the applicant's eligibility for a loan and the amount of money the business could receive under the PPP. Applicants also were required to make certain good faith certifications, including that current economic uncertainty necessitated a loan request to support ongoing business operations.

g. PPP loan proceeds were required to be used by the business, sole proprietorship, or self-employed individual for certain permissible business expenses, in particular, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal owed on the PPP loan to be entirely forgiven by the SBA if the business, sole proprietorship, or self-employed individual spent the loan proceeds on eligible business expenses within a designated period of time, and used a certain percentage of the PPP loan proceeds for payroll expenses.

h. To gain access to funds through the PPP, businesses, sole proprietorships, and self-employed individuals applied to financial institutions

participating in the PPP, and received loan proceeds directly from those financial institutions.

i.　　An eligible business, sole proprietor, or self-employed individual who obtained a PPP loan and properly used the full amount of the loan proceeds in accord with Program rules was allowed to obtain additional PPP funds by submitting a Second Draw Borrower Application Form signed by the applicant or an authorized representative of the business. The Second Draw Application required the applicant to again acknowledge Program rules and to make certain affirmative certifications regarding the eligibility of the business, and to provide the applicant's number of employees and average monthly payroll. Those figures were used to calculate the applicant's eligibility for a loan and the amount of money the business could receive under the PPP. Applicants also were required to make good faith certifications, including that current economic uncertainty had necessitated a loan request to support ongoing business operations and that the full amount of the initial PPP loan was used (or would be used before the disbursement of any PPP Second Draw loan) only for eligible expenses.

j.　　Participating lenders required applicants for PPP loans to provide truthful information about the sole proprietorship, self-employed individual, or business and its owner, including truthful information about the applicant's number of employees, payroll, and how the PPP loan would be used, which information was material to the lenders' loan approval, loan terms, and funding of PPP loans.

### The Lenders

k.      Lender A was a financial institution, more specifically, an insured, state-chartered credit union located in the State of Illinois, which funded PPP loans to approved borrowers.

l.      Lender B was a financial institution, more specifically, an FDIC-insured bank headquartered in the State of Ohio, which funded PPP loans to approved borrowers. Lender B maintained a computer server located outside of Illinois.

### The Scheme to Defraud

3.      Beginning in or about 2020, and continuing until in or about 2022, in the Northern District of Illinois, Eastern Division, and elsewhere,

### RICHARD L. CARLINO,

defendant herein, knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money in connection with applications for PPP loans, by means of materially false and fraudulent pretenses, representations, and promises, as described below.

4.      It was part of the scheme that CARLINO, for the purpose of fraudulently obtaining PPP loans in an amount totaling approximately $737,295, knowingly submitted loan applications to Lender A and Lender B (collectively, "the Lenders"), and caused loan applications to be submitted to the Lenders, on behalf of business entities purportedly owned and operated by CARLINO and members of his family, namely, SSIG, RealtyOne, and True Respiratory Care (collectively, "the Subject

Entities"), which PPP loan applications contained materially false statements and misrepresentations concerning, among other things, the Subject Entities' number of employees and average monthly payroll.

5.     It was further part of the scheme that CARLINO prepared and submitted false and fraudulent PPP loan applications to the Lenders, and caused false and fraudulent PPP loan applications to be prepared and submitted to the Lenders, on behalf of each of the Subject Entities. Such PPP loan applications falsely and fraudulently inflated the number of employees employed by each Subject Entity, and the amount of average monthly payroll paid by each Subject Entity, and falsely and fraudulently represented that all PPP loan proceeds would be used only for eligible, business-related purposes. At the time that the PPP loan applications were prepared and submitted to the Lenders, CARLINO knew (a) that the Subject Entities employed fewer employees, and paid lesser amounts of payroll, than represented in the loan applications, and (b) that CARLINO intended to use at least a portion of the loan proceeds, if not all of the loan proceeds, for the personal benefit of himself and members of his family, not for legitimate, eligible business costs.

6.     It was further part of the scheme that the PPP loan applications prepared and submitted by CARLINO, and caused to be prepared and submitted by CARLINO, falsely represented that the Subject Entities did not have common management with any other business, when in fact, as CARLINO then knew, he was a manager of all three of the Subject Entities.

7. It was further part of the scheme that, through the submission of the false and fraudulent PPP loan applications, CARLINO caused the Lenders to disburse loan proceeds, in the form of official checks and deposits into bank accounts controlled by CARLINO and his wife, in an amount totaling approximately $737,295.

8. It was further part of the scheme that CARLINO used the fraudulently obtained PPP loan proceeds to make purported bi-weekly payroll payments to himself and members of his family, among other payments inconsistent with the intent and purposes of the PPP. At the time CARLINO made those purported payroll payments, CARLINO knew that he and his family members had not been receiving any such regular payroll checks prior to the pandemic and the establishment of the Program, and he further knew that such payments were excessive and unnecessary to retain legitimate company employees.

9. It was further part of the scheme that CARLINO prepared and submitted to the Lenders, and caused to be prepared and submitted to the Lenders, PPP loan forgiveness applications which falsely and fraudulently represented, among other things, the Subject Entities' number of employees, payroll costs, and business rent payments, and which falsely and fraudulently certified that the previously disbursed PPP loan proceeds were used to pay the Subject Entities' eligible business expenses. As CARLINO then knew, the Subject Entities had fewer employees and paid lesser amounts of payroll and rent than represented in the PPP loan forgiveness applications, and all of the loan proceeds had not been used to pay the Subject Entities' eligible business expenses.

18

10.     It was further part of the scheme that, in order to substantiate the claimed number of employees and payrolls of the Subject Entities, CARLINO submitted false tax records to the Lenders, and caused false tax records to be submitted to the Lenders, including a false Employer's W-2 Report and false Employer's Quarterly Federal Tax Returns (IRS Form 941), which tax records falsely and fraudulently represented that the Subject Entities had paid a specified numbers of employees various amounts in wages, tips, and other compensation in tax years 2019 and 2020. As CARLINO then knew, the Subject Entities did not employ the claimed number of employees or pay the amounts of employee compensation during those tax years, as claimed in those false tax records.

11.     It was further part of the scheme that CARLINO fraudulently induced the Lenders and SBA to forgive all the PPP loans that had been issued to SSIG, RealtyOne, and True Respiratory Care.

12.     It was further part of the scheme that CARLINO misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence of the scheme, the purposes of the scheme, and the acts committed in furtherance of the scheme.

### Execution of the Scheme

13.     On or about May 14, 2020, in the Northern District of Illinois, Eastern Division,

RICHARD L. CARLINO,

defendant herein, for the purpose of executing the scheme described above, and attempting to do so, knowingly caused to be delivered by mail, according to the direction thereon, an official check payable to SSIG in the amount of $113,900, from Lender A in Evergreen Park, Illinois, to CARLINO's residence in Orland Park, Illinois, which check constituted the proceeds of a PPP loan to SSIG;

In violation of Title 18, United States Code, Section 1341.

## COUNT SEVEN
### (Mail Fraud)

The SPECIAL MAY 2022 GRAND JURY further charges:

1.      Paragraphs 1 through 12 of Count Six are incorporated here.

2.      On or about May 15, 2020, in the Northern District of Illinois, Eastern Division,

### RICHARD L. CARLINO,

defendant herein, for the purpose of executing the scheme described above, and attempting to do so, knowingly caused to be delivered by mail, according to the direction thereon, an official check payable to RealtyOne in the amount of $64,300, from Lender A in Evergreen Park, Illinois, to RealtyOne's office suite in Orland Park, Illinois, which check constituted the proceeds of a PPP loan to RealtyOne;

In violation of Title 18, United States Code, Section 1341.

## COUNT EIGHT
**(Wire Fraud)**

The SPECIAL MAY 2022 GRAND JURY further charges:

1.      Paragraphs 1 through 12 of Count Six are incorporated here.

2.      On or about January 29, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

RICHARD L. CARLINO,

defendant herein, for the purpose of executing the scheme described above, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an internet transmission of a PPP Second Draw Borrower Application, on behalf of RealtyOne, to Lender B's computer server located outside of Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT NINE
### (Wire Fraud)

The SPECIAL MAY 2022 GRAND JURY further charges:

1.     Paragraphs 1 through 12 of Count Six are incorporated here.

2.     On or about March 26, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

### RICHARD L. CARLINO,

defendant herein, for the purpose of executing the scheme described above, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an internet transmission of a PPP Second Draw Borrower Application, on behalf of SSIG, to Lender B's computer server located outside of Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNTS TEN THROUGH FIFTEEN
### (Money Laundering)

The SPECIAL MAY 2022 GRAND JURY further charges:

1.      Paragraphs 1 and 2 of Count Six are incorporated here.

2.      On or about the dates listed below, each such date constituting a separate count of this indictment, in the Northern District of Illinois, Eastern Division, and elsewhere,

RICHARD L. CARLINO,

defendant herein, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions—more specifically, deposits of checks in the amounts listed below, on or about the dates listed below, into accounts of the payees listed below, involving the use of a financial institution which was engaged in, and the activities of which affected, interstate commerce:

| Count | Date | Payor | Payee | Amount |
|-------|------|-------|-------|--------|
| Ten | May 20, 2020 | SSIG | RealtyOne | $9,500 |
| Eleven | May 21, 2020 | RealtyOne | SSIG | $8,500 |
| Twelve | June 1, 2020 | SSIG | RealtyOne | $9,500 |
| Thirteen | June 1, 2020 | RealtyOne | SSIG | $8,500 |
| Fourteen | June 30, 2020 | SSIG | RealtyOne | $9,500 |
| Fifteen | June 30, 2020 | RealtyOne | SSIG | $8,500 |

which financial transactions in fact involved the proceeds of specified unlawful activity, namely, mail fraud, in violation of Title 18, United States Code, Section 1341, CARLINO then knowing that the transactions were designed in whole and in part to

conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity;

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## COUNT SIXTEEN
**(False Statements)**

The SPECIAL MAY 2022 GRAND JURY further charges:

1.     Paragraphs 1 and 2 of Count Six are incorporated here.

2.     On or about May 8, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

### RICHARD L. CARLINO,

defendant herein, knowingly made false statements to Lender A for the purpose of influencing the action of Lender A upon a PPP loan application. More specifically, in a Borrower Application Form submitted on behalf of SSIG, CARLINO falsely stated, among other things, that:

a.     SSIG's average monthly payroll was $45,583;

b.     SSIG had six employees; and

c.     SSIG did not have common management with any other business,

when in fact, as CARLINO then knew, each of those statements was false because SSIG did not have six employees and an average monthly payroll of $45,583, and he was a manager of two other businesses seeking PPP loans, namely, RealtyOne and True Respiratory Care;

In violation of Title 18, United States Code, Section 1014.

## COUNT SEVENTEEN
### (False Statements)

The SPECIAL MAY 2022 GRAND JURY further charges:

1.      Paragraphs 1 and 2 of Count Six are incorporated here.

2.      On or about March 26, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

RICHARD L. CARLINO,

defendant herein, knowingly made false statements to Lender B for the purpose of influencing the action of Lender B upon a PPP Second Draw loan application. More specifically, in a Second Draw Borrower Application Form submitted on behalf of SSIG, CARLINO falsely stated, among other things, that:

a.      SSIG's average monthly payroll was $59,446;

b.      SSIG had nine employees; and

c.      SSIG did not have common management with any other business,

when in fact, as CARLINO then knew, each of those statements was false because SSIG did not have nine employees and an average monthly payroll of $59,446, and he was a manager of two other businesses seeking PPP loans, namely, RealtyOne and True Respiratory Care;

In violation of Title 18, United States Code, Section 1014.

## FORFEITURE ALLEGATION ONE
### (Proceeds of Investment Fraud Scheme)

The SPECIAL MAY 2022 GRAND JURY further alleges:

1.     The allegations in Counts One through Five are incorporated here for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.     As a result of his violations of Title 18, United States Code, Sections 1341 and 1343, as alleged in Counts One through Five,

RICHARD L. CARLINO,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all right, title, and interest he may have in any property, real and personal, which constitutes and was derived from proceeds traceable to such violations.

3.     The interests of CARLINO subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), include the sum of $500,000, which may be satisfied in part from the following property:  15622 Catalina Court, Orland Park, Illinois.

4.     If any of the forfeitable property described above, as a result of any act or omission by CARLINO:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

28

e.   has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the

provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28,

United States Code, Section 2461(c);

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title

28, United States Code, Section 2461(c).

## FORFEITURE ALLEGATION TWO
### (Proceeds of PPP Loan Fraud Scheme)

The SPECIAL MAY 2022 GRAND JURY further alleges:

1.      The allegations in Counts Six through Nine are incorporated here for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.      As a result of his violations of Title 18, United States Code, Sections 1341 and 1343, as alleged in Counts Six through Nine,

### RICHARD L. CARLINO,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all right, title, and interest he may have in any property, real and personal, which constitutes and was derived from proceeds traceable to such violations.

3.      If any of the forfeitable property described above, as a result of any act or omission by CARLINO:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c);

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____

FOREPERSON

_____
Signed by Jason Yonan on behalf of the
ACTING UNITED STATES ATTORNEY